**Joseph MANAGO, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant.**

**No. 03–CV–2977(JBW).**

United States District Court,
E.D. New York.

June 18, 2004.

Mark J. Keller, Mark J. Keller, Abramson & Keller, Woodside, NY, for Plaintiff.

Sharon L. Volckhausen, United States Attorneys Office, Eastern District of New York, Brooklyn, NY, for Defendant.

### MEMORANDUM, JUDGMENT & ORDER

WEINSTEIN, Senior District Judge.

#### I. Introduction

Claimant, Joseph (sometimes referred to as Joanna) Manago, appeals from a decision by the Administrative Law Judge ("ALJ") denying a request for disability insurance benefits. The claim alleges inability to work because of suffering from severe depression, anxiety, and post-traumatic stress secondary to gender identity disorder/transsexualism.

Although no decision in which disability benefits were sought on this ground has been cited, the case arises at a time when legal protections for transsexuals are being expanded. See, e.g., Smith v. Salem, Ohio, 2004 WL 1745840 (6th Cir. Aug. 5, 2004) (allegations that employee was discriminated against based soley on his identification as transsexual are actionable under Tilte VII); Schwenk v. Hartford, 204 F.3d 1187, 1200 (9th Cir.2000) (protections of the Gender Motivated Violence Act extend to transsexuals); Rentos v. Oce–Office Systems, 1996 WL 737215, at *8–9 (S.D.N.Y.1996) (transsexuals protected from discrimination under New York State and City human rights laws); Lie v. Sky Publishing Corp., 2002 WL 31492397, at *5 (Mass.Super.2002) (transsexual plaintiff had established prima facie case of discrimination based on sex and disability

under state law prohibiting employment discrimination); *Enriquez v. West Jersey Health Systems,* 342 N.J.Super. 501, 777 A.2d 365, 373 (2001) (transsexuals protected by state law prohibitions against sex and disability discrimination); Cal. Gov't Code § 12949 (employer should allow employee to dress consistently with his or her gender identity); 2004 N.M. Laws Ch. 115 (prohibiting distinctions on the basis of gender identity in public accommodation and housing); R.I. Gen. Laws § 34–37–4 (prohibiting discrimination in housing accommodation on the basis of gender identity or expression); N.Y.C. Admin. Code § 8–102(23) (amending the New York City Human Rights Law to prevent discrimination based on an individual's gender identity, self-image, appearance, behavior, or expression).

This case involves a limited issue—fixing the correct onset date of total disability based upon mental problems for social security purposes. It is contended that the ALJ failed to apply the proper legal principles when determining the onset and severity of claimant's mental impairments; that the ALJ did not address the significance of a report by an expert that claimant had been completely incapable of withstanding the pressures of work since 1986; and that the record before the ALJ overwhelmingly supports a finding as a matter of law that claimant has met the definition of disability. Claimant moves for an order reversing the ALJ's final decision and remanding the case for calculation of benefits.

The Commissioner acknowledges that the ALJ committed legal error by not adequately considering the available medical evidence in determining that claimant was not disabled prior to June 1990. The government moves to remand the case for further proceedings. It opposes claimant's motion for a judgment on the pleadings on the ground that the record does not establish satisfaction of the statutory definition of disability as of the date when total disability is alleged to have occurred.

For the reasons stated below, claimant's motion for a judgment on the pleadings is granted and the case is remanded for calculation of benefits.

## II. *Facts*

### A. *Personal History*

Claimant, who has a Master's Degree and has worked as a high school and college biology teacher, stopped teaching on December 23, 1986 and thereafter collected unemployment benefits. Tr. at 38–39, 41, 49, 51. No steady job has been held since then, although claimant has given music lessons from home. Tr. at 155.

Claimant testified to cessation of work in 1986 because of extreme anxiety and depression relating to a gender identity problem. Tr. at 62 –63. Claimant felt like a woman in a man's body. Tr. at 44. According to claimant, these feelings began in early childhood between the ages of 5 to 7 years. Tr. at 41. By late 1986, claimant could not concentrate, experienced insomnia, could not bear the male identity, and eventually stopped working because it was too painful to wear men's clothes to work. Tr. at 44, 63. Thereafter, claimant went into a depression and stayed at home. Tr. at 46.

Claimant was married in May 1987 and had two children. Tr. at 41–42. At first, claimant waited to be alone to put on women's clothes. Tr. at 47. Sometime between 1987–90, although claimant could not recall precisely when, claimant revealed to claimant's wife the gender identity disorder. Tr. at 46–47. In 1990, claimant began dressing full time in women's clothing. Tr. at 47. The couple separated in 1994. Tr. at 43.

Claimant's former wife, in recalling the events of 1986–87, testified that claimant was very tense, could not get along at

work and that their social life was non-existent. Tr. at 68–69. She agreed with claimant's characterization of her spouse's emotional problems during this time period and confirmed that claimant had no money with which to seek professional help. Tr. at 70, 71–72.

### B. *Medical History*

Claimant testified to seeing two psychiatrists because of depression and anxiety experienced as a result of gender identity problems. Both doctors opined that the mental problems were severe and recommended therapy. Tr. at 59–61. Claimant also reported undergoing therapy at Bellevue Hospital for three months. Tr. at 61–62. There is, however, no available documentation of medical examinations or treatment with these doctors.

Claimant testified that lack of funds prevented any psychiatric treatment between 1987–1994 until becoming eligible for Medicaid. Tr. at 45, 55–56. However, in 1993, claimant attended a group therapy program at the Gay and Lesbian Community Services Center and also sought and received information about a gender treatment program in Texas. Tr. at 48–49, 99–101. From May to August 1994 claimant underwent outpatient counseling at Bellevue Hospital, participating in four psychotherapy sessions to address depression and gender identity disorder, but was discharged from the program due to noncompliance with medication. Tr. at 124–27.

Claimant has seen a number of doctors and mental health professionals since becoming eligible for Medicaid in 1994. They all agree that claimant suffers from depression and anxiety secondary to gender identity disorder.

In 1994, claimant began treating at the Bleuler Psychotherapy Center. In the initial assessment, the social work intern reported that claimant presented wearing women's clothing, makeup and perfume. Tr. at 179. He also noted that claimant was suffering from extreme stress due to fear of attacks caused by appearance. Tr. at 183.

Claimant underwent a psychiatric consultation with Dr. Arthur Jacobs in October 1994. Dr. Jacobs diagnosed gender identity disorder and recommended weekly psychotherapy. Tr. at 156. In a second session two months later, Dr. Jacobs reported that claimant may suffer from chronic depression and panic disorder. Tr. at 159.

Phyllis Graziano, a social worker and psychotherapist, extensively treated claimant during claimant's time at Bleuler Psychotherapy Center. In February 1996, Ms. Graziano diagnosed gender identity disorder and major depression. Tr. at 166. She also stated that claimant's condition precluded ability to work. *Id.* Several months later, she upgraded the diagnosis to transsexualism because it had lasted for more than two years. Tr. at 167. In discussing the typical manifestations of gender identity disorder/transsexualism, Ms. Graziano noted,

> As stated in DSM IV [Diagnostic and Statistical Manual of Mental Disorders—Fourth Edition], "the majority of boys with this disorder begin to develop it before their fourth birthday, and many times cross-dressing becomes frequent and habitual." Subsequently, transsexualism leads to "persistent or recurrent discomfort and sense of inappropriateness about one's assigned sex." Again, according to DSM IV, "although people who first present clinically with gender identity problems, may be of any age, in the vast majority of cases, the onset of the disorder can be traced back to childhood." Thusly, "social and occupational functioning are markedly impaired, partly because of associated psy-

chopathology, and partly because of problems encountered in attempting to live in the desired gender role." Many transsexuals are treated as societal outcasts due to its uncommon prevalence, as only one male per 30,000 are afflicted with this disorder.

Tr. at 108.

In August 1996, Ms. Graziano reported that claimant's "compulsive and uncontrollable cross-dressing, since 1989, has caused intense conflict, equating to severe anguish." Tr. at 110. Because of claimant's severe depressive moods, antidepressant medication was recommended. Tr. at 109. In a February 1997 letter Ms. Graziano stated, "[I]t is my professional opinion that this patient would NOT have been able to work at ANY job because of 'internal gender conflict,' and 'overwhelming feelings of guilt and shame due to his/her sense of false identity as a male.'" Tr. at 108 (emphasis and quotations in original). In a July 1997 letter, she reported, "Mr./Ms. Manago also suffers with depression with anxiety, and sometimes experiences bouts of hyperactivity which prohibits him/her from remaining in closed areas for prolonged periods of time. Joseph/Joanna lives a reclusive lifestyle due to ridicule and harassment received in public, and is presently unemployed due to the same." Tr. at 107.

In September 1999, Dr. Martin Maurer, also of the Bleuler Psychotherapy Center, opined that claimant suffered from "a long history of Gender Identity issues, [and] occasional depressive symptoms." Tr. at 162.

In March 2000, Dr. Brian Leggiere, a clinical psychologist, conducted an evaluation. He diagnosed gender identity disorder and post-traumatic stress disorder. Tr. at 132. According to Dr. Leggiere, "Although [claimant] has long struggled with issues of gender identity and dysphoria, his present psychological problems appear to have developed in the past ten years." Tr. at 131. Dr. Leggiere then proceeded to trace the onset of claimant's psychological problems to a series of traumatic events beginning with the revelation to claimant's former wife of the gender identity disorder. Id.

In February 2003, claimant saw Dr. Connie Christine Wheeler, a psychotherapist and sexologist who specializes in gender identity disorders/transsexualism. She is a charter member of the Harry Benjamin International Gender Dysphoria Association, Inc., co-author of the current medical treatment guidelines for gender identity disorders, and co-author of a treatment chapter on gender identity disorders/transsexualism in Treatments of Psychiatric Disorders (Second Edition) by the American Psychiatric Press, Inc. (1995). Tr. at 115, 432–38. According to Dr. Wheeler,

> On the basis of having examined Joseph/Joanna Manago, reviewing the above materials and my professional experience, I am of the opinion that Joseph Manago has suffered an ongoing total disability primarily as a result of his Gender Identity Disorder, accompanied by atypical anxiety, post-traumatic stress disorder, and chronic depression since the mid–1980's.

> .    .    .    .    .

> Historically, the medical psychotherapy treatments this patient has received for both symptoms and the diagnosed conditions added to the original impetus for his/her medical deterioration; while at moments they initially seemed to have brought some relief from the patient being totally immobilized and nonfunctional, ultimately and quite quickly proved to be of little relief whatsoever.

> .    .    .    .    .

In my opinion, Joseph/Joanna Manago's abilities to do work related mental activities and live his/her life productively, with knowledge and understanding, and in personally secure and stable ways is significantly impaired since his psychiatric collapse in 1986 ... At the point of Joseph's total disabling psychiatric breakdown in 1986, and subsequent relapses, I believe Joseph/Joanna Manago felt pushed to his/her very limits just to survive. He/she was treated for depression anxiety and considered a suicidal risk. He has not recovered from the cumulative debilitating events and symptoms that created psychiatric collapse for him/her seventeen years ago, and as a result, he/she cannot engage in any work due to psychiatric conditions.

Joseph/Joanna Manago remains totally disabled from all work, as he[/she] is completely incapable of withstanding any of the stress and demands of work. He/she has been unable to work since his breakdown in 1986 and this total disability unfortunately continues today.

Tr. at 115, 116, 123.

In her report Dr. Wheeler also commented on the nature of gender identity disorder/transsexualism:

As my colleagues and I have written in the chapter "Gender Identity Disorders" in *Treatment of Psychiatric Disorders* (Vol. 2) edited by Glen O. Gabbard, M.D. and published by the American Psychiatric Association in 1995, "Although histories of psychiatric treatment for substance abuse, adjustment disorders, serious suicidal thoughts, and depression are not uncommon in gender dysphoric patients, there is no evidence of a frequent occurrence of comorbidity, making comparison with estimates in the general population meaningless. Many of these disorders are defense mechanism against the frustration, psychological pain, anxiety, and discrimination stemming from patients' inability to live safely and comfortably in society with their condition or in their desired gender roles."

A clinical picture emerges when a person's concerns and uncertainties, distress, and questions about their gender identity continue and they remain feeling conflicted. Gender conflicted or dissatisfied people are diagnosed as suffering from a gender identity disorder when they meet specified criteria in one of two official diagnostic sources—*Diagnostic and Statistical Manual of Mental Disorders—Fourth Edition (DSM–IV)* or the *International Classification of Diseases—10 (ICD–10)*. For example, *DSM IV* 302.85 Gender Identity Disorder (GID) in adolescents or adults diagnostic criteria includes: a strong and persistent cross-gender identification; and persistent discomfort with one's sex, or sense of inappropriateness in the gender role of that sex; absence of physical intersex condition; and disturbances causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Tr. at 116–17 (footnotes and emphasis omitted).

III. *Procedural History*

Claimant applied for disability insurance benefits in September 1993 claiming a cardiac condition, damage to the right wrist and arm, esophagitis, and fatigue. Tr. at 85. An application for Supplemental Security Income (SSI) benefits was made in May 1994. Tr. at 445. Both applications were initially denied. *Id.*

Claimant then requested a hearing before an Administrative Law Judge, which was held in June 1996. At the hearing, claimant testified to suffering from a gen-

der identity problem and to extreme anxiety and depression secondary to that condition causing cessation of work in December 1986. Tr. at 446.

The ALJ denied claimant's claim for disability but granted the request for SSI benefits. Tr. at 448–49. He found that claimant was under a "disability" within the meaning of the Social Security Act, but that disability could not be established at a time when claimant had disability insured status. Tr. at 446. Claimant's insured status ended on June 30, 1990. The ALJ found that the medical evidence established claimant had severe depression as of May 1994. Tr. at 447. The ALJ further determined that claimant had not engaged in substantial activity since December 30, 1986, was unable to perform claimant's past work as a teacher, and did not have any skills transferable to other types of work. Tr at 447–48.

In June 2000, the Appeals Council denied claimant's request for review because it was untimely. Tr. at 25–27. Claimant sought review in the United States District Court for the Eastern District of New York. In February 2002, this court remanded the case because the administrative record was not available. Tr. at 12.

A second hearing was held before the ALJ in March 2003. Tr. at 34–74. At issue in the second hearing was whether claimant was disabled between December 23, 1986 and June 30, 1990, the date of last insurance coverage. Tr. at 7. The ALJ denied claimant's request for benefits, finding no "severe" impairment during the relevant time period. Tr. at 10. The ALJ stated that claimant had failed to submit any documentation of treatment for a physical or mental impairment during the relevant period and declined to find a disability purely on the basis of claimant's testimony as to symptoms. Tr. at 8–9. Neither the report by Dr. Wheeler nor

Social Security Regulation 83–20, which outlines the procedures for determining the onset of nontraumatic mental disabilities, is mentioned in the ALJ's decision. The opinion reflects a denial of any possibility of a retroactive finding of onset of disability during a period when claimant was not being treated by medical professionals.

Claimant appeals, pursuant to 42 U.S.C. § 405(g), from the ALJ's March 2003 decision.

## IV. *Law*

### A. *Determining "Disability"*

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual shall only be considered to be under a disability "if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). Physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are determinable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence ... there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological or psycho-

logical abnormalities which could reasonably be expected to produce the pain or other symptoms alleged...." 42 U.S.C. § 423(d)(5)(A).

A five-step sequential evaluation process is used to determine disability. If the individual is found to be disabled or not disabled at any step, the remainder of the evaluation process is suspended. 20 C.F.R. § 404.1520(a)(4). First, non-disability will be found unless claimant is not working at a "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, non-disability will be found unless claimant shows a "severe impairment" which "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, it is determined whether the impairment is on the list of impairments presumed severe enough to render one disabled. If so, claimant is found disabled without considering age, education and work experience. 20 C.F.R. § 404.1520(d). If the impairment does not meet or equal the criteria on the list, a claimant's "residual functional capacity" (defined as what a claimant can still do despite his limitations) is reviewed and the physical and mental demands of the work he has done in the past is evaluated to determine whether he can still do that kind of work. Unless the claimant shows he cannot do that work, he is determined to be not disabled. 20 C.F.R. § 404.1520(e),(f); 20 C.F.R. § 404.1545. Finally, if the claimant cannot do the work he has done in the past, his residual functional capacity and age, education, and past work experience are considered to determine whether he is capable of performing other jobs existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(g); 20 C.F.R. § 404.1560(c).

There is an additional process required for the evaluation of mental impairments, in which pertinent medical findings are reviewed and the degree of a claimant's functional loss is rated to determine the severity of the mental disorder. 20 C.F.R. § 404.1520a; *see also* Mazin A. Sbaiti, Note, *Administrative Oversight? Towards a Meaningful "Materiality" Determination Process for Dual–Diagnosis Claimant Seeking Disability Benefits Under Titles II & XVI of the Social Security Act,* 35 Colum. Hum. Rts. L.Rev. 415, 422–23 (2004) (discussing heightened requirements in mental disability cases).

■■■ In determining disability, controlling weight is given to opinions from acceptable medical treating sources about the nature and severity of the claimant's impairments if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence of record. 20 C.F.R. § 404.1527(d)(2). In weighing such opinions, consideration is given to the length, nature and extent of the treatment relationship, the frequency of treatment, the objective medical support for the opinion, the consistency of the opinion with the record as a whole and the area of specialty of the medical source. *Id.* The final determination of disability is reserved to the Social Security Administration. *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999).

### B. *Determining Onset of Disability*

Social Security Regulation (SSR) 83–20 specifies the procedures to be followed in determining the onset of disability:

> In disabilities of nontraumatic origin, the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. The weight to be given any of the relevant evidence depends on the individual case.

1. Applicant Allegations

The starting point in determining the date of onset of disability is the individual's statement as to when disability began.

2. Work History

The day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date.

3. Medical and Other Evidence

Medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability. The medical evidence serves as the primary element in onset determination. Reports from all medical sources (e.g., physicians, hospitals, and government agencies) which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling. With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.

SSR 83–20. When it is alleged that the disabling impairment occurred prior to the first recorded medical examination, the ALJ should call on the services of a medical advisor for assistance in evaluating the available medical evidence to infer the on-set date. *Id.* Family and friends may also be asked to furnish evidence regarding the course of a claimant's condition. *Id.*

C. *Standard of Review*

A district court reviews the SSA's decision to determine whether it is based upon correct legal standards and is supported by substantial evidence. *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir.1997). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). A finding of fact, if supported by substantial evidence, is conclusive. 42 U.S.C. § 405(g).

The court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.* Remand for further proceedings is appropriate in cases in which the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the application and regulations. *See Williams v. Apfel,* 204 F.3d 48, 50 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir.1999); *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980).

Only where the record is "sufficiently complete" and provides "persuasive evidence of total disability," thus rendering further proceedings pointless, should the district court award benefits itself and remand simply for calculation of such benefits. *Williams,* 204 F.3d at 50; *see also Martinez v. Barnhart,* 262 F.Supp.2d 40 (W.D.N.Y.2003) (reversing determination

of onset date and awarding benefits given that there were no significant conflicts in the record); *Arroyo v. Callahan*, 973 F.Supp. 397 (S.D.N.Y.1997) (same). Remand for further proceedings is also unnecessary in cases in which the Commissioner has failed to appoint an independent medical expert to assist in the determination of the onset date of the disability, but there are no significant conflicts on the record below for the expert to evaluate. *See Carroll v. Secretary of Health and Human Services*, 705 F.2d 638, 644 (2d Cir.1983); *Martinez*, 262 F.Supp.2d at 49–50; *Arroyo*, 973 F.Supp. at 400–01.

## V. *Application of Law to Facts*

A review of the entire record supports a finding that claimant's total disability began sometime between 1986 and 1990. Contrary to the ALJ's opinion, the absence of contemporaneous medical records does not preclude a finding that claimant was disabled prior to the expiration of insured status. Rather, onset of disability may be inferred in accordance with the criteria set forth in SSR 83–20.

Claimant testified that confusion as to gender identity began in early childhood between the ages of 5 to 7. By 1980, two psychiatrists with whom claimant consulted recommended therapy because of severe mental problems. In December 1986, claimant's levels of anxiety and depression related to gender identity conflict were so high that claimant could no longer accept male identity and stopped working. Between 1986–90, claimant stayed home all day depressed, dressing up in women's clothing when alone. By 1990, claimant was dressing in women's clothing full-time.

Claimant's work history also supports these claims. Teaching ceased in December 1986 and there has been no appreciable employment since then. Claimant's testimony is further corroborated by the former wife. She reported that claimant was very tense and anti-social during the late 1980s.

The medical reports of claimant's treating physicians, to the extent that they consider onset date, support a determination of total disability beginning in the latter 1980s. Of considerable importance are the reports authored by claimant's psychotherapist and social worker at the Bleuler Psychotherapy Center, Phyllis Graziano, because she extensively treated claimant. Ms. Graziano wrote several reports and letters during 1996–97 opining that claimant experienced severe depression and anxiety secondary to gender identity disorder, and that, as a result, claimant could not work or perform jury duty. In one such letter in 1997, she retrospectively considers claimant's inability to work, thus implying that claimant had suffered from a total disability for some time previously, "[I]t is my professional opinion that this patient would NOT have been able to work at ANY job ...." (emphasis in original).

Dr. Brian Leggiere, with whom claimant consulted on March 14, 2000, also determined that claimant suffered from gender identity disorder, but indicated that the current psychological problems began ten years earlier when the problem was revealed to the former wife. According to claimant's own testimony, disclosure of the gender identity confusion and cross-dressing was made to her sometime between 1987 to 1990.

Finally, Dr. Wheeler, an expert on gender identity disorders/transsexualism, found that claimant had a "psychiatric collapse" in 1986 and that since that time, has suffered an "ongoing total disability" consisting of gender identity disorder accompanied by anxiety, post-traumatic stress syndrome and chronic depression.

The ALJ's finding that claimant's total disability did not begin prior to the date of last insured status—June 30, 1990—is not supported by substantial evidence. It is therefore reversed.

█ Because the record contains persuasive proof of total disability at least from March 14, 1990, and the rest of the factors, as determined by the ALJ, favor a finding of disability under the Social Security Act, a remand for further evidentiary proceedings would serve no purpose. The appointment of a medical advisor to assist with onset determination is pointless because there are no significant conflicts on the record for the expert to evaluate. Entry of a judgment of disability and remand for calculation of benefits is appropriate.

█ Although it is uncontradicted that claimant suffered a total disability before the expiration of insured status, the record is not without inconsistencies as to the precise onset date. Claimant's own testimony as well as the report prepared by Dr. Wheeler favor an onset date of December 1986. Dr. Leggiere points to March 1990 as the period when claimant's current psychological problems began. The remaining medical evidence does not specify an onset date, although it supports a finding that claimant's feelings of gender identity confusion began in early childhood and eventually led to severe depression and anxiety between 1986 to 1990. In view of the inconsistencies in the record, claimant will be awarded disability benefits from the latest possible onset date—March 14, 1990.

## VI. *Conclusion*

The case is remanded for calculation of benefits from March 14, 1990.

SO ORDERED.