WILLIAM F. KUNTZ, II, United States District Judge:
William Gallishaw ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Acting Commissioner of the Social Security Administration (the "Commissioner") denying Plaintiff's application for Social Security Disability Insurance ("SSDI") benefits. Plaintiff challenges the determination of an Administrative Law Judge (the "ALJ") that he is not disabled within the meaning of the Social Security Act and requests that the Court vacate the Commissioner's decision and either find that Plaintiff is disabled and remand the matter solely for calculation of benefits, or, in the alternative, remand the matter for renewed administrative proceedings, including a new hearing. See Compl. at 2, ECF No. 1; Pl. Br. at 13, ECF No. 15. The Commissioner requests that the Court grant her cross-motion for judgment on the pleadings and affirm her decision that Plaintiff is not entitled to SSDI benefits. See Def. Br. at 1, 28, ECF-No. 17. For the reasons that follow, Plaintiff's motion for judgment on the pleadings is GRANTED, the Commissioner's cross-motion is DENIED, and this case is REMANDED for a determination of benefits.
BACKGROUND
Plaintiff was born on April 29, 1966, Tr. at 33-34, 158, ECF No. 6, and graduated from high school in 1984, id. at 162. After high school, Plaintiff worked first as a forklift operator for a frozen foods company and then as an unarmed driver at JFK airport, which involved loading and unloading airplanes. See id. at 34-42. From January 1999 through April 2012, he worked as a forklift operator and unloader at the Fulton Fish Market, which required him to be standing or walking for most of the day and to lift or carry 25 to 80 pounds. Id. at 36-41, 162-63. On April 25, 2012, Plaintiff was struck by a forklift at work, resulting in injuries to his left leg-including a substantial loss of skin and muscle-and lower back. Id. at 32, 42-43, 257, 286. He required a skin graft from both of his thighs to his left leg and was hospitalized for six weeks, after which he began physical therapy.
*488 Id. at 43, 257. Plaintiff has not worked since the accident. Id. at 13, 34, 38, 42, 50.
A. Medical Evidence
1. Dr. Nangia
When Plaintiff's symptoms persisted several months after his hospitalization and subsequent physical therapy, he was referred to Dr. Bhim S. Nangia, a board certified neurologist, for evaluation and further treatment. Id. at 257. During Dr. Nangia's first examination of Plaintiff, on August 10, 2012, he observed that Plaintiff had pain, muscle spasms, and a restricted range of motion in his back; had swelling, scarring, below normal reflexes, diminished sensation to touch, and reduced muscle strength in his left leg; and walked with a limp. Id. at 258-60. Dr. Nangia diagnosed Plaintiff with lumbar sprain /strain, lumbar radiculitis, left leg neuralgia, and possible lumbar radiculopathy and prescribed continued physical therapy and chiropractic treatment. Id. at 260. He also requested authorization to conduct a magnetic resonance imaging ("MRI") study of Plaintiff's lumbar spine to rule out disc herniation and an electromyography /nerve conduction velocity ("EMG/NCV") study of Plaintiff's lower extremities to rule out nerve root irritation. Id.
On September 5, 2012, Dr. Nangia completed a "Medical Assessment of Ability to Do Work-Related Activities" form regarding Plaintiff's exertional limitations. Id. at 248-50. In the assessment, Dr. Nangia stated that: Plaintiff could lift and/or carry a maximum of only ten pounds, either frequently or occasionally, because "[l]ifting of greater than 101b will cause [patient's] [lower back problem] to get worse, causing increased radiation into the [left] leg" and "[h]eavy lifting will cause exacerbation of patient symptoms," id. at 248; Plaintiff could stand and/or walk for a total of less than two hours in an eight-hour workday because, "[d]ue to pain in the low back [and] the [left] leg[,] patient is unable to stand/walk for extended periods of time," id. at 249; Plaintiff could sit for a total of less than six hours in an eight-hour work day and would need to alternate sitting and standing periodically because "[c]hanging position frequently w[ould] help reduce pain [and] stiffness," id .; and Plaintiff's ability to push and/or pull was limited in the lower extremities because, "[d]ue to [left] leg weakness and low back pain, patient's use of lower extremities [was] limited," id.
Plaintiff continued to see Dr. Nangia for his back and leg pain throughout the following year, including on October 24, 2012, November 19, 2012, December 26, 2012, February 6, 2013, May 20, 2013, and August 7, 2013. See id. at 261, 265, 268, 271, 275, 279. In his treatment notes for each visit, Dr. Nangia repeatedly observed that Plaintiff: (1) walked with a limp, id. at 261, 265, 268, 271, 275, 279; (2) exhibited moderate tenderness, dull sharp pain, and muscle spasms in his neck, id. at 261, 265, 268, 271, 275, 279-80; (3) exhibited dull sharp pains, muscle spasms, and a limited range of motion in his lower back, id. at 263, 266, 269, 271-72, 275-76, 279-80; and (4) exhibited below normal reflexes, diminished sensation to light touch, and diminished strength in his left leg, id. at 263, 266, 269, 272, 276-77, 280-81. In addition, in his treatment notes from May and August 2013, Dr. Nangia also observed that Plaintiff had a limited range of motion in his left knee. Id. at 276, 280. Throughout the course of his treatment by Dr. Nangia, Plaintiff rated his pain at at least four to five, and on most occasions at six or eight, "based on a scale with 0 equal to no pain and 10 equal to worst possible pain." Id. at 257, 261, 265, 268, 271, 275, 279.
In his treatment notes from his final two examinations of Plaintiff, Dr. Nangia *489 wrote that Plaintiff "ha[d] shown improvement of symptoms for which he was originally evaluated and treated." Id. at 275, 279. Nevertheless, aside from partially reduced severity of pain, Dr. Nangia reported that Plaintiff continued to suffer from many of the same symptoms and limitations that he had in all previous treatment notes throughout the preceding year. Indeed, Dr. Nangia's diagnosis as of August 7, 2013 was identical to that of August 10, 2012, except that, by 2013, he had confirmed Plaintiff's lumbar radiculopathy with an MRI and had made additional diagnoses of anterior femoral and saphaneous nerve neuralgia and of left knee derangement. Compare id. at 281 (August 2013 diagnosis), with id. at 260 (August 2012 diagnosis). Accordingly, Dr. Nangia continued to prescribe the same course of treatment in August 2013, with the additional recommendations that Plaintiff undergo another EMG/NCV of his lower extremities and an MRI of his left knee and consider orthopedic evaluation. Id. at 281.
2. MRI Results
As noted above, Dr. Nangia ordered an MRI of Plaintiff's lumbosacral spine to rule out disc herniation, which was performed on October 2, 2012. Id. at 251. In a report on the results of the MRI, Dr. Harold S. Parnes, a board certified diagnostic radiologist, indicated Plaintiff was suffering from "large posterior disc herniation" at the L1-L2, L2-L3, L3-L4, L4-L5, and L5-S1 levels with impingement and compression of his spinal cord, as well as straightening and reversal of the normal curvature of his spine and multilevel disc space narrowing and loss of fluid. Id. at 251-52; accord id. at 277, 281.
3. Dr. Thukral
On December 19, 2012, Dr. Vinod Thukral, a consultative examiner, conducted an examination of Plaintiff at the request of the Division of Disability Determination. See id. at 225-28. In his report, Dr. Thukral noted that Plaintiff "walk[s] with a limp favoring the right leg, with and without [a] cane," and could not walk on his heels and toes or squat "due to left lower extremity and left knee pain." Id. at 226. Accordingly, Dr. Thukral concluded that Plaintiff "does need the cane at this time for balance, support, and ambulation." Id. In addition, Dr. Thukral observed "mild tenderness in the lumbar spine on movement," as well as "moderate swelling along with moderate tenderness on movement" and limited flexion and extension in the left knee. Id. at 227. Based on his examination, Dr. Thukral opined that Plaintiff "has moderate to marked limitations for standing (for a long time), bending, pulling, pushing, lifting, carrying, and any other such related activities due to left lower extremity pain and left knee pain, along with lower backache." Id. at 228.
4. EMG/NCV Results
As noted above, Dr. Nangia ordered an EMG/NCV study of Plaintiff's lower extremities to rule out nerve root irritation, which was performed on February 13, 2013. Id. at 253. In a report on the results of the study, Dr. Nangia indicated there was evidence that Plaintiff was suffering from chronic left L5-S1 radiculopathy. Id. at 254; accord id. at 281.
5. Dr. Fkiaras
On October 23, 2013, Dr. John Fkiaras, also a consultative examiner, conducted a second examination of Plaintiff at the request of the Division of Disability Determination and completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." See id. at 235-44. In his examination report, Dr. Fkiaras noted that Plaintiff walked with a limp "with and without the use of a cane," was unable to walk on his heels and toes, and could squat only one-third of the way down. Id. at 236.
*490 In addition, as to Plaintiff's back, Dr. Fkiaras observed that his lumbar spine showed limited flexion, extension, and rotary movement and "[i]t was painful to light touch of the bilateral lumbar region." Id. at 237. As to Plaintiff's left leg, Dr. Fkiaras found limited flexion in Plaintiff's left knee; "decreased sensation to light touch in the left medial and lateral thigh, in the left medical [sic] and lateral calf, and the left foot"; and diminished strength in Plaintiff's left lower extremity. Id. Accordingly, in his examination report, Dr. Fkiaras concluded that Plaintiff had a moderate to severe limitation walking and climbing stairs, a moderate limitation sitting for extended periods of time, and a moderate limitation bending, and that he was restricted from activities which require prolonged standing and from any lifting, carrying, pushing, pulling, squatting, kneeling, and crouching. Id. at 238.
Similarly, in his medical source statement, Dr. Fkiaras opined that Plaintiff could: lift and carry no more than ten pounds occasionally; sit for no more than forty-five minutes at one time without interruption and for no more than a total of six hours in an eight-hour work day; stand for no more than thirty minutes at one time without interruption and for no more than a total of two hours in an eight-hour work day; walk for no more than twenty minutes at one time without interruption and for no more than a total of one hour in an eight-hour work day; ambulate no more than two blocks without the use of a cane; occasionally push and/or pull with his right and left hands, but should not push or pull more than ten pounds; continuously operate foot controls with his right foot but never with his left foot; and never balance, stoop, kneel, crouch, crawl, or climb stairs, ramps, ladders, or scaffolds. Id. at 239-42.
6. Dr. Fuchs
On August 20, 2014, the assigned ALJ, Lori Romeo, submitted a medical interrogatory and request for a medical source statement to Dr. Louis A. Fuchs, an orthopedic surgeon who never examined or treated Plaintiff. Id. at 287-99, 301-03. In his response to the interrogatory, based solely on a review of medical records provided by the ALJ, Dr. Fuchs stated that he disagreed with Dr. Fkiaras's functional capacity assessment because: "[m]otor power good arms [sic] ... so can lift, carry heavier [weights]. Back motion limited but does not preclude sitting, standing longer Nothing in record precludes use upper limbs [sic]. Control of legs is decent so he can do more than stated." Id. at 306 (citations omitted). As evidence in support of these conclusions, Dr. Fuchs cited to: (1) Dr. Thukral's examination report, (2) Dr. Nangia's treatment notes dated October 24, 2012, (3) Dr. Fkiaras's examination report, and (4) and Dr. Nangia's treatment notes dated December 26, 2012. Id. Dr. Fuchs also stated that Plaintiff's functionality had improved, as evidenced by Dr. Nangia's treatment notes dated October 24, 2012, which, Dr. Fuchs asserted, "shows reflexes [equal], sensation intact [and] motor power [with no limitations]." Id. at 307.
In his medical source statement, also based solely on his review of medical records provided by the ALJ, Dr. Fuchs concluded that Plaintiff could: lift and carry up to ten pounds continuously and up to twenty pounds occasionally; sit for two hours at one time without interruption and for a total of eight hours in an eight-hour work day; stand for one hour at one time without interruption and for a total of three hours in an eight-hour work day; walk for one hour at one time without interruption and for a total of two hours in an eight-hour work day; ambulate normally, *491 requiring the use of a cane only "at times"; continuously reach overhead, push, and pull with both hands; continuously operate foot controls with his right foot and occasionally operate foot controls with his left foot; can continuously balance; and occasionally stoop, kneel, couch, crawl, and climb stairs and ramps. Id. at 308-11.
B. Other Evidence
1. Plaintiff's Testimony
During his hearing before the ALJ on July 14, 2014, Plaintiff testified that his ability to work was limited by the injuries to his left leg and lower back that he sustained during the accident. Id. at 42. Specifically, he testified that he: required a cane for balance and for walking, id. at 43-44; could only stand up for about fifteen minutes at a time, id. at 48; could only sit for about twenty minutes at a time, id. at 48-49; frequently needed to move around, reposition, and stretch due to pain and stiffness in his back and leg, id .; and could only carry ten pounds, id. at 48. See also id. at 185 ("I must do everything slowly and carefully."). In addition, Plaintiff testified that bending, exposure to cold weather, and twisting or turning made the pain worse, id. at 44-45, and that his ability to turn his body was limited, id. at 45. With regard to his pain, Plaintiff testified that, on most days, his pain was-on a scale of zero to ten, with zero being no pain and ten being the worst pain possible-a six or seven in his back, a seven to eight in his leg, and a five to six in his neck. Id. at 43-44. He also explained that, since he lost his health insurance, he had been treating his pain with over the counter medications, such as Motrin and aspirin, and by wrapping a hot towel around his leg, which had previously been prescribed by his physical therapist while he was still insured. Id. at 45-46.
2. Vocational Interrogatory
After the hearing, the ALJ submitted a vocational interrogatory to Andrew Vaughn, a vocational expert, which included two hypotheticals. See id. at 207-12. The first hypothetical assumed an individual of Plaintiff's age and with his education and work experience, who had the residual functional capacity ("RFC") to perform light work[1] with the limitations described by Dr. Fuchs-specifically, an individual who could: sit for eight hours in an eight-hour day and for up to two hours continuously; stand for three hours in an eight-hour day and for up to one hour continuously; walk for two hours in an eight-hour day and for up to one hour continuously; ambulate without a cane most of the time; use, without limitation, his arms to push, pull, or reach; has no limit to balance; and occasionally stoop, kneel, crouch, crawl, and climb stairs and ramps. Compare id. at 216 (first hypothetical), with id. at 308-11 (Dr. Fuchs's medical source statement). Mr. Vaughn stated that, although such an individual would not be able to perform any of Plaintiff's past jobs, he could perform three unskilled occupations with jobs that exist in the national economy: addressing clerk, press operator, or lens inserter. Id. at 216-17.
*492 The second hypothetical assumed an individual of Plaintiff's age and with his education and work experience, who had the RFC to perform sedentary work[2] with limitations more consistent with those described by Dr. Nangia, Dr. Thukral, and Dr. Fkiaras-specifically, an individual who could: sit for five hours in an eight-hour day but would periodically need to change position from sitting to standing; and stand and walk for one hour in an eight-hour day; but not use foot controls. Compare id. at 218 (second hypothetical), with id. at 248-50 (Dr. Nangia's medical assessment), and id. at 226-28 (Dr. Thukral's examination report), and id. at 239-42 (Dr. Fkiaras's medical source statement). Mr. Vaughn stated that such an individual could not perform any unskilled occupations with jobs that exist in the national economy because "[t]he limitations of this RFC do not meet the requirements for a fulltime 8hr competitive work day, and there would be no unskilled occupations that can be performed." Id. at 219.
C. Procedural History
Plaintiff applied for SSDI benefits on August 22, 2012, asserting he had been unable to work since April 25, 2012, id. at 145, the date of his accident. After his claim was denied on January 30, 2013, id. at 59, 64-68, Plaintiff timely requested a hearing by an ALJ to challenge the denial, id. at 76-81. As noted above, the ALJ held a hearing on July 14, 2014, at which Plaintiff was represented by an attorney and testified on his own behalf. Id. at 28-52 (transcript of hearing). No doctors or other experts testified at the hearing. In a decision dated February 25, 2015, the ALJ found Plaintiff did not have a disability within the meaning of the Social Security Act between April 25, 2012, and the date of her decision. Id. at 10-21. Plaintiff appealed the ALJ's decision to the Notice of Appeals Council, id. at 5-6, 286, which declined to review his case on May 16, 2016, id. at 1-3, and this denial became the Commissioner's final act. On June 3, 2016, Plaintiff filed his Complaint in this Court. See ECF No. 1.
LEGAL STANDARDS
I. Standard of Review of Final Decision of Commissioner
When a claimant challenges a denial of disability benefits by the Social Security Administration ("SSA"), the Court's function is not to evaluate de novo whether the claimant is disabled, but rather to determine "whether the correct legal standards were applied and whether substantial evidence supports the decision." Butts v. Barnhart , 388 F.3d 377, 384 (2d Cir. 2004) ; see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"); Moran v. Astrue , 569 F.3d 108, 112 (2d Cir. 2009) (applying "substantial evidence" standard of review). Substantial evidence is "more than a mere scintilla"-it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales , 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting Consol. Edison Co. of N.Y., Inc. v. NLRB , 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) ). The substantial evidence test applies not *493 only to the Commissioner's factual findings, but also to inferences and conclusions of law drawn from those facts. See Carballo ex rel. Cortes v. Apfel , 34 F.Supp.2d 208, 214 (S.D.N.Y. 1999) (Sweet, J.). In determining whether the record contains substantial evidence to support a denial of benefits, the reviewing court must examine the entire record, weighing the evidence on both sides to ensure the claim "has been fairly evaluated." See Brown v. Apfel , 174 F.3d 59, 62 (2d Cir. 1999) (quoting Grey v. Heckler , 721 F.2d 41, 46 (2d Cir. 1983) ). Although "the ALJ need not resolve every conflict in the record, 'the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence.' " Calzada v. Asture , 753 F.Supp.2d 250, 268-69 (S.D.N.Y. 2010) (Sullivan, J.) (citations omitted) (quoting Ferraris v. Heckler , 728 F.2d 582, 587 (2d Cir. 1984) ).
To fulfill this burden, the ALJ must "adequately explain his reasoning in making the findings on which his ultimate decision rests" and must "address all pertinent evidence." Kane v. Astrue, 942 F.Supp.2d 301, 305 (E.D.N.Y. 2013) (Kuntz, J.) (quoting Calzada , 753 F.Supp.2d at 269 ). "[A]n ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." Id. (internal quotation marks and citations omitted). Remand is warranted when "there are gaps in the administrative record or the ALJ has applied an improper legal standard." Rosa v. Callahan , 168 F.3d 72, 82-83 (2d Cir. 1999).
II. Determination of Disability
For the purposes of SSDI benefits, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment in question must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).
To determine whether a claimant is disabled, the Commissioner must apply the five-step sequential process set forth in 20 C.F.R. § 404.1520. See, e.g., Rosa , 168 F.3d at 77 (laying out the five-step process for evaluating disability claims). The claimant bears the burden of proving the first four steps, while the burden shifts to the Commissioner at the fifth step. Id. First, the Commissioner must determine whether the claimant is engaged in "substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not so engaged, the second step is to determine whether the claimant has a "severe medically determinable physical or mental impairment." Id. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the third step is to determine whether the impairment or combination of impairments meets or equals one of the listings in Appendix 1 of the regulations. Id. § 404.1520(a)(4)(iii). If the claimant's impairment does not match any of the listings, the fourth step is to determine whether the claimant's RFC allows the claimant to perform past relevant work. Id. § 404.1520(a)(4)(iv). If the claimant cannot perform past relevant work, the final step is to determine whether the claimant can perform another job based on his or her RFC, work experience, age, and education. Id. § 404.1520(a)(4)(v).
III. Treating Physician Rule
In evaluating the available medical evidence as part of an application for *494 disability benefits, "[t]he law gives special evidentiary weight to the opinion of the treating physician[s]." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 188 (2d Cir. 1998). Specifically, the regulations state:
Generally, [the SSA] give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.
20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). For these reasons, the opinion of a treating physician is given controlling weight on the issue of the nature and severity of a claimant's impairments, so long as that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Id. "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).
If the ALJ does not give a treating physician's opinion controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the case record, then the ALJ must assess six factors to determine how much weight to afford the treating medical opinion and other medical opinions. See 20 C.F.R. §§ 404.1527(c), 416.927(c). These factors are: (1) whether the physician examined the claimant; (2) the nature and extent of the treatment relationship, including the length of the relationship and the frequency of examination; (3) the evidence in support of each opinion, such as medical signs, laboratory findings, and more complete explanations; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the medical provider is a specialist; and (6) any other relevant factors. Id. §§ 404.1527(c), 416.927(c). After considering the above factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran v. Barnhart , 362 F.3d 28, 33 (2d Cir. 2004). Remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion." Id. "The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." Greek v. Colvin , 802 F.3d 370, 375 (2d Cir. 2015) (citing Burgess v. Astrue , 537 F.3d 117, 131 (2d Cir. 2008) ).
IV. Assessment of a Claimant's Credibility
SSA regulations also require an ALJ "to take the claimant's reports of pain and other limitations into account, but the ALJ is not obligated to accept the claimants subjective complaints without question." Campbell v. Astrue , 465 Fed.Appx. 4, 7 (2d Cir. 2012) (alterations omitted) (quoting Genier v. Astrue , 606 F.3d 46, 49 (2d Cir. 2010) ). "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Genier , 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b) ). Second, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the *495 objective medical evidence and other evidence' of record." Id. (quoting 20 C.F.R. § 404.1529(a) ). "The ALJ will consider all of the available medical evidence, including a claimant's statements, treating physician's reports, and other medical professional reports." Fontanarosa v. Colvin , 13-CV-3285, 2014 WL 4273321, at *12 (E.D.N.Y. Aug. 28, 2014) (Brodie, J.) (citing Whipple v. Astrue , 479 Fed.Appx. 367, 370-71 (2d Cir. 2012) ).
"To the extent that a claimant's allegations of pain 'are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry.' " Id. (quoting Meadors v. Astrue , 370 Fed.Appx. 179, 184 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii) )). In making a credibility determination, the ALJ must consider seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) any treatment, other than medication, the claimant has received; (6) any other measures the claimant employs to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of pain or other symptoms. See 20 C.F.R. § § 404.1529(c)(3)(i)-(vii), 416.929(c)(3).
DISCUSSION
Plaintiff asserts that the ALJ erred in concluding that he is not disabled under the Social Security Act. Specifically, he argues that the ALJ failed to apply the correct legal standards in assigning weight to the opinion of Plaintiff's treating physician and in assessing Plaintiff's credibility and that the ALJ's RFC determination and finding of no disability were not supported by substantial evidence.
Plaintiff does not dispute the ALJ's determinations at the first four steps of the five-step analysis, namely that Plaintiff: (1) had not engaged in substantial gainful activity since April 25, 2012, the alleged onset date of his disabling conditions; (2) had two severe impairments, lumbar spine myofascitis and chronic synovitis of the left knee; (3) did not have an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ; and (4) was unable to perform any past relevant work. Tr. at 13-14, 19. Instead, Plaintiff contends that the ALJ erred in her determination of Plaintiff's RFC, leading to a step-five determination that is unsupported by substantial evidence. Before step four, the ALJ determined that Plaintiff has the RFC to perform light work,
except that, because of lumbar spine myofascitis and chronic synovitis of the knee, he has the following limitations: In an eight-hour workday, he can sit up to eight (8) hours and can sit continuously for up to two (2) hours, he can stand for a total of three (3) hours and up to one (1) hour continuously, and he can walk for a total of two (2) hours and up to one (1) hour continuously. He can lift up to 20 pounds at a time and can lift and/or carry frequently up to 10 pounds. He needs a cane occasionally to ambulate. He can climb stairs and ramps occasionally and he can occasionally stoop, kneel, crouch, and/or crawl. He can occasionally be exposed to humidity, wetness, and extremes of heat and cold but must avoid ladders, scaffolds, and vibrations. He has no limitations using the arms to push, pull, or reach and has no limitations handling, gripping, grasping, or feeling. He has no limitations balancing.
*496 Id. at 14-15. At step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform based on the vocational expert's response to the first hypothetical posed, id. at 19-20, which assumed an RFC to perform light work, which was consistent with the ALJ's ultimate determination. Plaintiff argues that the ALJ's RFC determination is based on an erroneous assessment of the medical evidence-specifically, unreasonable reliance on the opinion of a non-examining physician to the exclusion of other medical evidence in the record, including the opinion of a treating physician and diagnostic reports-and that her step-five determination is therefore not supported by substantial evidence. The Court addresses these contentions in turn.
I. Whether the ALJ Applied the Correct Legal Standards
A. Treating Physician Rule
Plaintiff asserts that the ALJ did not provide a meaningful rationale for her rejection of the findings of Dr. Nangia, Plaintiff's treating physician, or her reliance instead on the opinion of Dr. Fuchs, a physician who had never examined Plaintiff. The Court agrees.
The ALJ accorded "no more than some weight" to Dr. Nangia's opinion concerning the nature and severity of Plaintiff's impairments as stated in his medical assessment, id. at 16, but she failed to explain how it was unsupported by medically acceptable evidence or inconsistent with other substantial evidence in the record. Instead, while she conceded that Dr. Nangia's opinion "might have been reflective of the claimant's condition at the time," she stated that she did not credit it because his subsequent examinations "indicate symptoms and clinical signs of improvement in functioning" and he recommended "only conservative treatment that has consisted of no more than physical therapy, chiropractic treatment, non-steroidal anti-inflammatory medications, and analgesics like Motrin and Neurontin." Id. at 15-16. In this Circuit, "[s]uch falls far short of the standard for contradictory evidence required to override the weight normally assigned the treating physician's opinion." Shaw v. Chater , 221 F.3d 126, 134 (2d Cir. 2000). Indeed, the record contains no indication that Dr. Nangia's opinions "were unsupported by medical evidence or that his opinion is inconsistent with the record as a whole." Id. Moreover, the ALJ failed to assess several of the required factors-such as the length, nature, and extent of the treatment relationship between Dr. Nangia and Plaintiff, the evidence in support of Dr. Nangia's opinion, and the consistency of his opinion with other evidence in the record, including diagnostic tests-to determine how much weight to afford Dr. Nangia's opinion or comprehensively to set forth her reasons for the weight assigned to it.
In his medical assessment, Dr. Nangia opined that: Plaintiff can lift and/or carry a maximum of ten pounds, either frequently or occasionally; Plaintiff can stand and/or walk for a total of less than two hours in an eight-hour workday; Plaintiff can sit for a total of less than six hours in an eight-hour work day and must periodically alternate sitting and standing; and Plaintiff's ability to push and/or pull is limited in his lower extremities. Tr. at 248-49. These limitations, Dr. Nangia explained, were due to pain and weakness associated with Plaintiff's lower back and leg problems, id. , which he had diagnosed at the time as lumbar sprain /strain, lumbar radiculitis, left leg neuralgia, and possible lumbar radiculopathy, id. at 260. In the course of treating Plaintiff over the following year, Dr. Nangia confirmed these diagnoses, and added two more-anterior femoral *497 and saphaneous nerve neuralgia and left knee derangement-through further examinations and diagnostic tests, including an MRI and an EMG/NCV. Compare id. at 260 (August 2012 diagnosis and recommendations), with id. at 281 (August 2013 diagnosis and recommendations). Although he did note that Plaintiff had "shown improvement of symptoms" in May and August 2013, id. at 275, Dr. Nangia nevertheless also reported that Plaintiff continued to walk with a limp; continued to exhibit tenderness, dull sharp pains, muscle spasms, and a limited range of motion in his spine; and continued to exhibit a limited range of motion, below average reflexes, diminished sensation, and diminished muscle strength in his left leg, such that he required the same course of treatment and was still disabled as of August 2013. Id. at 279-81. Notably, when he examined Plaintiff two months later, in October 2013, Dr. Fkiaras observed substantially similar symptoms and reached substantially similar conclusions about Plaintiff's limitations. Compare id. at 235-44 (Dr. Fkiaras's October 2013 examination notes and medical source statement), with id. at 279-81 (Dr. Nangia's August 2013 treatment notes), and id. at 248-50 (Dr. Nangia's medical assessment). Dr. Nangia's opinion as stated in his medical assessment is also consistent with Dr. Thukra's examination notes from December 2012. See id. at 225-28.
By characterizing Dr. Nangia's findings in his May and August 2013 treatment notes as "nearly normal," id. at 16, and by assuming, without offering explanation or pointing to other medical evidence, that Plaintiff's persistent-albeit moderately improved-symptoms permitted a much broader functional capacity, the ALJ improperly substituted her "own expertise or view of the medical proof for the treating physician's opinion," Greek , 802 F.3d at 375 (citing Burgess , 537 F.3d at 131 ). Moreover, she only rejected Dr. Nangia's "medical opinion when it supported a finding that [P]laintiff was disabled; yet at the same time relied on [his later] observations, that [P]laintiff's condition was improving to provide proof that [P]laintiff was not disabled [earlier]. Such an inconsistent use of the medical evidence undermines any argument that [the treating physician's] opinion was so unreliable that it should not have been assigned controlling weight." Shaw , 221 F.3d at 135. In addition, the ALJ improperly characterized the fact that Dr. Nangia recommended only conservative treatment as evidence that Plaintiff was not physically disabled during the relevant period. "Essentially, the ALJ ... imposed [her] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered. This is not the overwhelmingly compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion." Id. at 134-35 (citing Wagner v. Sec'y of Health & Human Servs ., 906 F.2d 856, 862 (2d Cir. 1990) ). Because the ALJ rested [her] rejection of [the treating physician's] opinion on flawed reasoning and failed to provide any other reasons for rejecting the opinion, the ALJ erred." Greek , 802 F.3d at 376.
By contrast, the ALJ assigned "great weight" to the opinion of Dr. Fuchs, a medical consultant under contract with the SSA who never personally examined or met with Plaintiff, based on her contentions that his opinion "is supported by the clinical findings on record," "is based on a review of the entire record,... is not speculative,... cites to specific clinical findings for support," and "is consistent with Dr. Nangia's treatment notes." Tr. at 14, 18. In this Circuit, however, the opinion of a non-examining physician may be deemed not *498 "sufficiently substantial to undermine the opinion of the treating physician" when it is not adequately supported by evidence in the record. Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) ; cf. Hidalgo v. Bowen, 822 F.2d 294, 297 (2d Cir. 1987) ("A corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis."), limited by regulation as stated in Schisler v. Sullivan , 3 F.3d 563, 568 (2d Cir. 1993). Critically, Dr. Fuchs's conclusions here are both remarkably vague and inconsistent with the records that purportedly support them, as reflected in the table below.
Conclusion Evidence Cited "Motor power good arms ... so Dr. Thukral's December 2012 examination report, which can lift, carry heavier [weights]. indicated that Plaintiff had limitations on lifting and Tr. at 306. carrying "due to left lower extremity pain and left knee pain, along with lower backache." Id. at 228. "Back motion limited but does Dr. Nangia's October 2012 treatment notes, which not preclude sitting, standing indicated that Plaintiff was suffering from lumbar longer." Id. at 306. radiculitis and had muscle spasms, dull sharp pains, and a limited range of motion in his back, such that he was "unable to get up on his feet" and had "difficulty in standing, sitting, walking for prolonged periods." Id. at 261-63. "Control of legs is decent so Dr. Fkiaras's October 2013 examination report and [Plaintiff] can do more than medical source statement, which indicated that Plaintiff stated." Id. at 306. walked with a limp; was unable to walk on his heels and toes or squat fully; had limited flexion in his left knee; had decreased sensation to light touch in his left leg; and had decreased strength in his left lower extremity, such that he had moderate to severe limitations on walking, climbing stairs, and prolonged standing; could not operate foot controls with his left foot; and could never balance, stoop, kneel, crouch, or crawl. Id. at 235-44. Dr. Nangia's October and December 2012 treatment notes, which indicated that Plaintiff was suffering from left leg neuralgia; walked with a limp; and had below normal reflexes, diminished sensation to light touch, and diminished muscle strength in his left leg. Id. at 261-64, 268-70. Plaintiff's functionality Dr. Nangia's October 2012 treatment notes, which improved by October 2012, as indicated that Plaintiff "has shown no improvement of shown by "reflexes [equal], symptoms" and continued to exhibit below-normal sensation intact [and] motor reflexes, diminished sensation to light touch, and power [with no limitations]." Id. diminished muscle strength in his left leg. Id. at 261-63. at 307.
Not only do the records Dr. Fuchs cites not support his conclusions, in several instances they flatly contradict them. Moreover, the ALJ apparently relied heavily on Dr. Fuchs's credentials-noting that "he is a board-certified orthopedic surgeon and has a comprehensive understanding of the social security disability programs and requirements," Tr. at 18-but failed to explain how they distinguished him from the other qualified medical professionals who examined Plaintiff. Accordingly, Dr. Fuchs's report may properly be discounted as insufficiently substantial to undermine *499 the opinion of Dr. Nangia, which is otherwise consistent with the record,[3] and the ALJ's heavy reliance on it was additional error.
B. Plaintiff's Credibility
Plaintiff also asserts the ALJ discounted his credibility with respect to his subjective assessment of his pain without providing a sufficient explanation. The Court agrees.
As a preliminary matter, although she recited the proper standard, the ALJ failed to undertake the steps required by the SSA regulations, as described above. Namely, she did not (1) explicitly address whether Plaintiff suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, (2) consider the extent to which Plaintiff's symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence of record, (3) explain how Plaintiff's allegations of pain are not substantiated by the objective medical evidence, or (4) consider all factors required as part of the final credibility inquiry. Instead, although she had found at step two that Plaintiff suffers from two severe impairments, both of which typically cause pain, the ALJ stated only that
claimant's symptoms are not entirely credible because, although he asserts almost constant and debilitating pain, he has not been to a doctor or a hospital since in or about September 2013 and has only been using over-the-counter medications. Moreover, although he alleges he lacked insurance, the claimant could not explain why he did not use the proceeds from his workers compensation [sic] settlement of $50,000 to get insurance and/or pay for medical care. In *500 addition, the claimant failed to provide any explanation as to why he also failed to apply for insurance when required to under the Affordable Care Act or seek Medicaid from the State of New York.
Tr. at 15 (citations omitted).
It is obvious, however, that "just because plaintiff's disability went untreated does not mean he was not disabled." Shaw , 221 F.3d at 133 ; see also id. ("While it is conceivable that a three-year gap in plaintiff's medical treatment might be part of a more extensive inquiry into whether he was in fact disabled, the fact of this time lapse does not negate the compelling evidence in the record as a whole that plaintiff was ... disabled."). Moreover, the ALJ's explanation misstates the record. During the hearing, both Plaintiff and his attorney testified that Plaintiff had lost his health insurance after receiving a $50,000.00 worker's compensation settlement in August 2013 (associated with his April 2012 workplace accident) and had to live off of the settlement money because he was unable to work. See Tr. at 32-33, 45-47. When asked by the ALJ why he did not use the money to pay for medical bills, Plaintiff explained, "I really was trying to hold onto it. I was helping my mother out at the time when she got sick. And I thought-I was trying to hold onto it as much as I can, without dwindling it down."Id. at 47. And his attorney testified that Plaintiff was "unable to receive Medicaid due to the fact that he got a large lump sum settlement which he still has a considerable amount of," id. at 32-33. The ALJ's decision to discount Plaintiff's credibility thus apparently rested primarily on the fact that Plaintiff did not adequately explain his failure to apply for insurance under the Affordable Care Act, which neither satisfies her obligations under the SSA regulations nor otherwise represents substantial evidence in support of her determination.
"Given the many times [P]laintiff was treated between his [April 2012] accident and [September 2013], and that his condition did not improve, it was not unreasonable for him to discontinue those treatments, particularly in light of his testimony that he could not afford further medical care." Shaw , 221 F.3d at 133. Rather, "[t]he facts that his condition did not improve, and that there was no suitable treatment other than physical therapy, bolster the argument that [P]laintiff's impairments were permanent and that he was unlikely to recover from them." Id. ; see also id. ("It would fly in the face of the plain purposes of the Social Security Act to deny claimant benefits because he is too poor to obtain additional treatment."). Accordingly, and particularly given the consistency of Plaintiff's stated symptoms with the medical evidence of record, the ALJ erred.
II. Whether Substantial Evidence Supports the ALJ's Determinations
A. Plaintiff's RFC
Next, Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence because it was based on an improper rejection of the opinions of Plaintiff's treating and examining physicians, as discussed above; failed to consider all of Plaintiff's impairments, and was otherwise inconsistent with the evidence of record. The Court agrees.
In arriving at an RFC determination, an ALJ must assess a claimant's exertional capabilities based on all of the relevant medical and other evidence and determine whether and to what extent the claimant is capable of performing each of the RFC elements. Cf. Rosa v. Callahan , 168 F.3d 72, 80-82 (2d Cir. 1999) (discussing Commissioner's burden to demonstrate that a claimant is capable of a particular type of *501 work). Here, as noted above, the ALJ determined that Plaintiff had the RFC to perform a range of light work with certain limitations. Specifically, she concluded that Plaintiff was capable of, inter alia , lifting up to twenty pounds; sitting continuously for up to two hours; standing continuously for up to one hour; walking continuously for up to one hour; and pushing, pulling, and reaching with no limitations. Tr. at 14-15; see also 20 C.F.R. § 404.1567(b) (definition of light work). Critically, however, these findings require a rejection of the opinions of Plaintiff's treating physician and a consultative examiner who examined Plaintiff, as well as of Plaintiff's own testimony, in favor of the opinion of a physician who never met Plaintiff. Indeed, both Dr. Nangia and Dr. Fkiaras, as well as Plaintiff himself, opined that Plaintiff was not capable of, inter alia , lifting more than ten pounds, Tr. at 48, 239, 248; sitting continuously for more than forty-five minutes, id. at 48-49, 240, 249; standing continuously for more than thirty minutes, id. at 48-49, 240, 249; walking continuously for more than twenty minutes, id. at 174, 176, 240, 249; or pushing and pulling, either frequently or more than ten pounds, id. at 175, 241, 249, all of which would preclude a finding that Plaintiff could perform light work even with restrictions. Cf. 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.... [A] job is in this category when it requires a good deal of walking or standing , or when it involves sitting most of the time with some pushing and pulling of arm or leg controls ." (emphasis added)).
By way of explanation, the ALJ claimed her RFC determination was "consistent with the 2013 treatment notes of Dr. Nangia, the absence of any treatment since October 2013, and the opinion of Dr. Fuchs," id. at 19, and that "a finding of disabling limitations is also unsupported by the treatment notes, which document only conservative treatment," id. at 15. As discussed above, however, her inconsistent use of Dr. Nangia's opinions and reliance on his conservative treatment and the gap in treatment as evidence of a lack of disability were improper. See Shaw , 221 F.3d at 134 (remanding for a determination of benefits where, inter alia , the district court and ALJ "improperly characterized the fact that [plaintiff's physician] recommended only conservative physical therapy, hot packs, EMG testing-not surgery or prescription drugs as substantial evidence that plaintiff was not physically disabled during the relevant period"). In fact, the ALJ's findings were supported only by Dr. Fuchs's report, which was not entitled to the great weight she afforded it. Moreover, the ALJ failed to explain how her RFC determination was consistent with Plaintiff's MRI and EMG/NCV results, which showed, respectively, that he suffered from (1) large posterior disc herniation with impingement and compression of his spinal cord, straightening and reversal of the normal curvature of his spine, and multilevel disc space narrowing and loss of fluid, Tr. at 251-52; and (2) chronic left L5-S1 radiculopathy, id. at 254. On this record, the Court finds that Plaintiff has adequately demonstrated his inability to perform light work as described by the ALJ and that the ALJ's determination to the contrary is not supported by substantial evidence.
B. Step-Five Determination
Finally, Plaintiff argues that the ALJ's conclusion at step five was not supported by substantial evidence because it incorporated and relied on her erroneous RFC determination, and that the Commissioner otherwise failed to meet its burden to show Plaintiff is capable of performing a *502 job that exists in significant numbers in the national economy. Again, the Court agrees.
As a preliminary matter, the parties do not dispute that Plaintiff is unable to perform any of his past relevant work. Nor does the Commissioner challenge the vocational expert's conclusion that an individual of Plaintiff's age, and with his education and work experience, who has the RFC to perform sedentary work with certain limitations consistent with the opinions of Dr. Nangia and Dr. Fkiaras, could not perform any unskilled occupations with jobs that exist in the national economy because "[t]he limitations of this RFC do not meet the requirements for a fulltime 8hr competitive work day, and there would be no unskilled occupations that can be performed." Tr. at 219. Rather, the Commissioner asserts she met her burden at this stage by identifying jobs that could be performed by an individual of Plaintiff's age, and with his education and work experience, who has the RFC to perform light work with the limitations described by the ALJ. Although it is true that the Commissioner did identify three such jobs, this does not satisfy her burden because, as discussed above, the ALJ relied on an inapposite hypothetical and substantial evidence does not otherwise support the conclusion that Plaintiff could perform those jobs. Cf. Rosa , 168 F.3d at 81 ("[T]he ALJ did not have substantial evidence justifying her decision that [claimant] retained the residual functional capacity to meet the exertional demands of [light] work."). In fact, the evidence of record instead supports the conclusion that Plaintiff has the RFC to perform only sedentary work with additional limitations, which the vocational expert opined does not exist in the national economy. Accordingly, the ALJ's conclusion that Plaintiff is not disabled is not supported by substantial evidence.
III. Remand
"A remand for a step five analysis that places of the burden of proof on the Commissioner to show that the claimant could perform other work in the economy, even if he could not perform his past work, is appropriate in cases where there is more uncertainty regarding the claimant's condition." Shaw , 221 F.3d at 135. "However, when a court finds 'no apparent basis to conclude that a more complete record might support the Commissioner's decision, [it may] opt[ ] simply to remand for a calculation of benefits.' " Talanker v. Barnhart , 487 F.Supp.2d 149, 160 (E.D.N.Y. 2007) (Ross, J.) (quoting Butts v. Barnhart , 388 F.3d 377, 385 (2d Cir. 2004) ).
Here, Plaintiff's treating physician, as well as two additional examining physicians, all opined-consistently with the medical evidence of record, with each other, and with Plaintiff's own testimony-that Plaintiff had the RFC to perform only sedentary work with additional limitations, and the vocational expert clearly stated that such an individual could not perform any unskilled occupations with jobs that exist in the national economy. The only arguable evidence to the contrary is Dr. Fuch's report, which may be discounted as not sufficiently substantial for the reasons discussed at length above. Accordingly, the Court finds that the record contains persuasive proof of disability and remand for further evidentiary proceedings would serve no further purpose. See, e.g ., Rivera v. Sullivan , 923 F.2d 964, 970 (2d Cir. 1991) (remanding for calculation of benefits where "a review of the record fails to reveal any evidence which would support a finding that [claimant] was capable of performing substantial gainful work which was available in the national economy"); Vargas v. Sullivan , 898 F.2d 293, 296 (2d Cir. 1990) (remanding for calculation of *503 benefits where "there was an infinitesimal likelihood that employment of any kind would be available" for claimant); Manago v. Barnhart , 321 F.Supp.2d 559, 570 (E.D.N.Y. 2004) (Weinstein, J.) (remanding for calculation of benefits where further proceedings or the appointment of an expert "is pointless because there are no significant conflicts on the record for the expert to evaluate").
CONCLUSION
For the foregoing reasons, Plaintiff's motion for judgment on the pleadings, ECF No. 14, is GRANTED and the Commissioner's cross-motion, ECF No. 16, is DENIED. The Clerk of Court is directed to enter a judgment of disability and remand the case for a determination of benefits.
SO ORDERED.

Per SSA regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Per SSA regulations, "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

In a further attempt to justify her reliance on Dr. Fuchs, the ALJ asserted there were "significant inconsistencies between the reports of the consultative examiners," Dr. Thukral and Dr. Fkiaras, and the treatment history, and so she accorded only "little weight" to their opinions, Tr. at 16-18, but, as with Dr. Nangia, she failed to provide adequate reasons for this conclusion. Specifically, she purportedly rejected the opinion of Dr. Thukral solely because "it is cast in vague and ambiguous terms," id. at 17, when it is plainly far more specific and detailed than Dr. Fuchs's report. Compare id. at 225-28 (Dr. Thukral's examination report), with id. at 305-07 (Dr. Fuch's responses to the medical interrogatory). As for Dr. Fkiaras, the ALJ contended that
he did not explain why the claimant would be as limited as his assessment suggests and be unable, for example, to balance or stoop when his examination elicited only some tenderness and nearly normal range of motion of the lumbar spine and only some weakness (4/5) and nearly normal range of motion of the left knee. In addition, Dr. Fkiaras's opinion is inconsistent with Dr. Nangia's treatment notes that demonstrate improvement in symptoms and clinical findings by early 2013 and with the fact that the claimant had discontinued all treatment (except for over-the-counter medications) by October 2013.
Id. at 17. First, these characterizations ignore Dr. Fkiaras's findings that Plaintiff walked with a limp, was unable to squat, and required a cane for balance, id. at 236, all of which readily explain why Plaintiff would be unable, for example, to balance or stoop. Second, by deeming Plaintiff's symptoms "nearly normal" and relying on Dr. Nangia's reports inconsistently, the ALJ improperly substituted her own expertise or view of the medical proof for the examining physician's opinion, as she did with Dr. Nangia. In fact, as explained above, the opinions of Dr. Thukral and Dr. Fkiaras are consistent with each other, that of Dr. Nangia, and other substantial evidence in the record, and thus should not have been discounted without providing good reasons. Giddings v. Astrue, 333 Fed.Appx. 649, 652-53 (2d Cir. 2009) (summary order); accord Lester v. Chater , 81 F.3d 821, 830 (9th Cir. 1995) ("As is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician.").